Charles P. Franklin (State Bar Number: 011209) chuck@chuckfranklin.com
Colby R. Kanouse (State Bar Number: 024601) colby@chuckfranklin.com
FRANKLIN & ASSOCIATES, P.A.
1920 E. University Drive, Suite 102
Tempe, Arizona 85281
Telephone: (480) 551-0406
Facsimile:  (480) 551-0407
Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Robert Barbee,<br>          Plaintiff,<br>vs.<br>Zurich American Insurance Company,<br>          Defendant. | Case Number: 2:11-cv-02586-MEA<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

Comes now, Plaintiff Robert Barbee, by and through counsel undersigned, pursuant to Rule 56, *Fed. R. Civ. Pro.*, and hereby respectfully submits this Motion for Summary Judgment. For the reasons more fully explained in the attached Memorandum of Points & Authorities, Plaintiff respectfully requests that this Honorable Court declare that Defendant Zurich American Insurance Company abused its discretion in denying his claim for disability benefits, made pursuant to an insurance policy governed by ERISA. The attached Memorandum of Points & Authorities is incorporated by this reference.

**MEMORANDUM OF POINTS & AUTHORITIES:**

**I.   Introduction:**

This matter involves the interpretation of a Permanent and Total Disability provision contained in an insurance policy governed by the Elderly Retirement Income Security Act of 1974 (ERISA), under which Plaintiff was an insured. Following a catastrophic motor vehicle accident on August 25, 2009, Plaintiff made a claim for disability benefits pursuant to the aforementioned policy, which contained a specific definition of permanent and total

1

disability. According to the policy's terms, Defendant was bound to pay Plaintiff $500,000.00 in accidental disability benefits in the event he became permanently and totally disabled as that term is defined in the policy. Despite being provided with competent evidence demonstrating that his accident injuries resulted in permanent and total disability under the policy terms, Defendant denied Plaintiff's claim. Plaintiff now seeks review of that determination, and submits that Defendant abused its discretion by misconstruing the terms of the policy and denying his claim without factual justification. Because the policy at issue in this matter is governed by ERISA, review is limited to the administrative record created during the claims handling process, which has been submitted by the parties under separate cover.

## II. Factual Background:

Prior to August 25, 2009, Plaintiff was an employee of Brinks U.S., Inc. (Brinks). PSOF 1. As a result of his employment with Brinks, Plaintiff was eligible to enroll in a group accident policy that was provided for the benefit of Brinks employees. PSOF 2. Plaintiff enrolled in the aforementioned group policy, and purchased Permanent and Total Disability insurance coverage with a principle sum limit of $500,000.00. SPOF 2-3. Said disability coverage is governed by the following policy terms:

> If an insured becomes Permanently and Totally Disabled as a result of an Injury We will pay a Permanent and Total Disability Benefit provided that he or she becomes Permanently and Totally Disabled within 365 days of the Injury; and the Permanent and Total Disability continues for 12 months. The benefit payable equals the Insured's Principle Sum less any amount payable pursuant to this Policy.
>
> For purposes of this benefit, Permanently and Totally Disabled shall mean that the Insured is totally and continually disabled and cannot work, for any income, at any job that he or she is reasonably suited by education, training or experience to do.

PSOF 8. The policy contains definitions, which help explain its terms. The definitions that are applicable to this matter are as follows:

> Injury means bodily injury directly caused by accidental means which is independent of all other causes, results from a Hazard, and occurs while the Covered Person is insured under this policy.
>
> Covered Person means any person who has insurance under the terms of this policy. It includes the Insured.
>
> Hazards are those events described in the Hazard pages attached to this policy to which the Coverages and Enhanced Benefits apply. The Hazards are listed on the schedule.
>
> Covered Loss means a loss which meets the requisites of one or more Coverage or Enhanced Benefit, results from a Hazard, and for which benefits are payable under this Policy.

PSOF 9. The aforementioned policy provisions are also subject to the following exclusion:

> A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from…..illness, disease or infection.

PSOF 10. It must also be noted that the policy designates Defendant as the payor of claims. In addition, it names Defendant as the claims fiduciary, and gives Defendant the right to determine eligibility for benefits and to construe the terms of the plan. PSOF 11.

As far back as 2004 Plaintiff had been diagnosed with psoriatic arthritis and cutaneous arthritis. PSOF 16. As a result of these afflictions, Plaintiff suffered from diffuse joint pain throughout his entire body, as well as soreness in his neck and back. PSOF 16. He treated for these issues with his primary care physician Dr. Edwards, as well as Dr. Fairfax at Arthrocare Arthritis Care & Research, P.C. (Arthrocare). PSOF 17. Dr. Edwards has described Plaintiff's arthritis and other pre-August 25, 2009 issues as "minor." PSOF 16.

The records generated as a result of Plaintiff's treatment at Arthrocare reveal that on August 24, 2009, Plaintiff's wife filled out a questionnaire for him, wherein she indicated that he had "much difficulty" performing basic functions. PSOF 18. However, it should be noted that up until August 25, 2009, Plaintiff was still able to continuously work full time as an armored car driver / hopper for Brinks. PSOF 19. It should also be noted that Brinks'

3

minimum standards for people occupying the driver / hopper position include the following: (1) loading and unloading an armored car; (2) maintaining the security of the vehicle and its cargo; (3) lifting and carrying a minimum of 50 pounds; (4) pass a D.O.T. physical examination and drug screening; and, (5) work in an armed environment. PSOF 20. There is nothing in Plaintiff's Brinks employment file that indicates that he was unable to perform the foregoing activities prior to August 25, 2009. PSOF 21. Instead, Plaintiff's employment file shows that he consistently received pay raises during his employment, which suggests that he was able to perform his job duties in a more than satisfactory manner. PSOF 21. Accordingly, the record clearly demonstrates that Plaintiff's arthritis was not "disabling" under any definition of the word.

On August 25, 2009, Plaintiff was involved in a catastrophic and life altering motor vehicle accident on the I-10 freeway in Phoenix, Arizona (the accident). PSOF 22. Following the accident Plaintiff was transported directly to St. Joseph's Hospital by the Phoenix Fire Department, where he was admitted for serious injuries to his neck and back. PSOF 23. The doctors at the hospital performed several diagnostic imaging studies, whereupon it was discovered that Plaintiff had suffered a "moderate right foraminal disk extrusion producing right C4-5 foraminal narrowing and mild effacement upon the right lateral ventral thecal sac." PSOF 24. In addition, the doctors at St. Joseph's located an acute compression fracture of the T12 vertebrae, which necessitated surgery. PSOF 25-26. Dr. Porter of Barrows Neurological Associates performed surgery to fixate Plaintiff's vertebrae on August 26, 2009, which involved pedicle screw fixation at T10, T11, T12, L1, and L2. PSOF 26. Following surgery, Dr. Porter opined as follows:

> "Clearly this was a very serious motor vehicle accident with a thoracic 12 burst fracture. [Plaintiff] underwent surgery which fixated this fracture. I would keep him off work for the period of 1 year. After that, assuming his fracture is well healed and he is, for the most part, not having pain, he likely could go back to work in a

4

sedentary capacity and maybe even one that involves physical labor."
PSOF 27.

It should also be noted that during the year following his surgery, the pain resulting from his accident injuries required that Plaintiff continuously take large amounts of narcotic analgesics, including Oxycontin, Morphine, Demerol, and Oxycodone. PSOF 28.

Given the severity of his injuries and the opinions expressed by Dr. Porter, Plaintiff opened a claim with Defendant shortly after his accident. In response to Plaintiff's queries regarding the matter, Defendant initially asserted that Plaintiff was only covered by a principle sum limit of $50,000.00. PSOF 5. When presented with evidence showing that Plaintiff had increased his principle sum limit to $500,000.00, Defendant conducted an investigation which included contact between the claims adjuster Karen Doyle and Richard Goldberg from Defendant's "business unit." PSOF 6. Emails sent between the two questioned whether Defendant had been eligible to increase his limit to $500,000.00 under the terms of the policy, and demonstrated Ms. Doyle's belief that he had not been allowed to increase his coverage. PSOF 6. Despite the foregoing, several months later Defendant conceded that the principle sum limit was $500,000.00. PSOF 7. It should be noted that prior to its concession, Defendant issued at least two separate letters stating that it had confirmed that the limit was actually $50,000.00. PSOF 7.

On January 13, 2010, approximately 4.5 months after his accident, Plaintiff was found to be permanently disabled pursuant to Social Security Administration (SSA) guidelines, with a primary diagnosis of mental disorder due to mood instability "on the heels of his severe back injury in 8/09." PSOF 29. One month after the SSA declared Plaintiff to be disabled per their guidelines, his employment at Brinks was terminated as a result of his inability to return to active duty status. PSOF 31.

On June 16, 2010, Plaintiff was hospitalized at Banner Gateway Medical Center after developing deep vein thrombosis in his lower left leg. PSOF 32. During his stay in the hospital, Dr. Hudspeth placed an IVC filter in his leg, and attempted a thrombolysis procedure that was not completed. PSOF 32. The records from Plaintiff's hospital stay, which lasted from June 4-10, 2010, note that he had been unable to work since his accident of August 25, 2009. PSOF 33.

On July 9, 2010, Plaintiff was hospitalized again, this time at Banner Baywood Medical Center, for acute renal failure and altered mental status. PSOF 34. The records from that visit indicate that Plaintiff's renal failure was the result of toxic levels of medication in his system, as well as dehydration. PSOF 34. Once Plaintiff's creatinine levels had improved, he was discharged on July 11, 2010, with instructions to alter his medication. PSOF 35.

On October 15, 2010, Plaintiff underwent an Independent Medical Examination with Dr. Powers of Affiliated Neurologists, LTD. PSOF 36. In his report, Dr. Powers agreed with Dr. Porter regarding Plaintiff's inability to work for one year following his surgery, stating:

> "Dr. Porter quite reasonably concluded that Mr. Barbee would be expected to have improved such that he could return to sedentary activity and possibly labor after one year from the initial surgery. That time frame has now passed. It should be noted that Mr. Barbee is illiterate and options available to him for sedentary activity may be limited."

PSOF 36 (emphasis added). Then, after reviewing surveillance videos taken March 28-30, 2011, Dr. Powers issued an addendum to his original report wherein he labeled Plaintiff a malingerer. PSOF 38. However, he never changed his opinion regarding the reasonableness keeping Plaintiff off work for at least a year following the fusion surgery performed on August 26, 2009. PSOF 38.

On June 29, 2011, Plaintiff underwent a psychological IME with Dr. Patricia

6

Johnson. PSOF 37. During her evaluation, Dr. Johnson performed the WRAT-4 reading test, and noted that Plaintiff's reading abilities ranked in the less than 1st percentile. PSOF 37. She further noted that his general fund of knowledge ranked in the bottom 9%, while his ability to from verbal abstractions ranked in the bottom 5% for his age. PSOF 37.

Shortly after Plaintiff's last IME with Dr. Johnson, on July 28, 2011, Defendant issued a letter denying Plaintiff's claim for disability benefits under the policy. PSOF 40. More specifically, the denial letter stated that Plaintiff was not currently disabled, and that if he was his disability was caused or contributed to by other ailments including arthritis and depression. PSOF 40. For the complete text of the denial letter please see paragraph 40 of Plaintiff's Separate Statement of Facts in Support of Summary Judgment.

Following the denial of his claim, Plaintiff submitted an administrative appeal, which contained additional records. PSOF 41. Unfortunately, on December 5, 2011, Defendant denied Plaintiff's appeal claiming that he was not Permanently and Totally Disabled by an Injury as required by the policy, and that if he was, such disability was caused or contributed to by illness, disease, or infection. PSOF 42.

**III. Rule 56, *Federal Rules of Civil Procedure*, ERISA and the Standard of Review:**

This matter involves judicial review of Defendant's denial of a claim for benefits, which Plaintiff made pursuant to an insurance plan governed by ERISA. See 29 U.S.C. § 1132(a)(1)(B). In *Firestone Tire & Rubber Co. v. Bruch*, the United States Supreme Court held that an ERISA plan administrator's role is fiduciary in nature, and that the determination of benefits in a particular case is a fiduciary act. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-113 (1989). Accordingly, the U.S. Supreme Court applied trust law principles when determining the standard of review applicable to a plan administrator's denial of benefits. *Id.* In situations analogous to the case at bar, where the plan itself grants

the plan administrator the right to interpret plan terms and determine eligibility for benefits, a reviewing court must review the plan administrator's denial of benefits for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. at 115. However, the Supreme Court has also recognized that an inherent structural conflict of interest exists in situations where the plan administrator is also the payor of benefits. *Metropolitan Life Ins. v. Glenn*, 554 U.S. 105 (2008). Indeed, a plan administrator's duties to plan participants often conflicts with its own self interest. *Id.* In order to militate against this conflict, the Supreme Court has instructed that in situations where a plan administrator operates under a conflict of interest, a reviewing court should temper the deference given during an abuse of discretion review with skepticism commensurate with the nature and extent of the conflict.  *Id.*

Abuse of discretion review is highly deferential. However, "applying a deferential standard of review does not mean that the plan administrator will prevail on the merits." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 674 (9th Cir. 2011). "What deference means is that the administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Id.* at 674-5. Meanwhile, a plan administrator abuses its discretion in determining the facts of a matter when its determinations are illogical, implausible, or without support in inferences that may reasonably be drawn from the facts in the administrative record. *Id.* at 675. It should also be noted that "[i]n the ERISA context, a motion for summary judgment is merely the conduit to bring the legal question before the district court, and the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply." *Harlick v. Blue Shield of Calif.*, 686 F.3d 699, 706 (9th Cir. 6-4-2012).

**IV. Law & Arguments:**

In the instant matter, Defendant operated under a substantial structural conflict of

8

interest, and abused its discretion in denying Plaintiff's claim for Permanent and Total Disability benefits by: (1) unreasonably misconstruing the plan's terms; and, (2) making illogical and implausible factual findings that were unsupported by the administrative record. Accordingly, this Honorable Court should overturn Defendant's conclusion that no Permanent and Total Disabilty benefits were owed to Plaintiff under the terms of the policy.

### A. *Defendant's Conflict of Interest*:

When reviewing an ERISA plan administrator's denial of benefits, the standard of review depends on whether the plan explicitly grants the administrator discretion to interpret the plan's terms and determine eligibility for benefits. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006). In the present matter, it is undisputed that the plan gave Defendant such discretion. PSOF 11. Accordingly, this Court must review Defendant's decision to deny benefits for an abuse of discretion, "tempered by skepticisim" commensurate with any conflict of interest born by the administrator. *Id.*

A conflict of interest arises most frequently where, as here, the same entity makes the coverage decisions and pays for the benefits. *Harlick v. Blue Shield of Calif.*, 686 F.3d at 707. This dual role always creates a conflict of interest, but the conflict is "more important…where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* Meanwhile, the conflict takes on less importance when the administrator takes "active steps to reduce potential bias and to promote accuracy," such as employing a "neutral, independent review process," or segregating employees who make coverage decisions from those who deal with the company's finances. *Id.* Review of the administrator's decision is also tempered by skepticism if the administrator took inconsistent positions during the claims handling process, failed to provide full review of the claim, or failed to follow proper procedures in denying the claim. *Id.*

9

In the instant case, Defendant is the claim administrator and payor of benefits. Accordingly, a structural conflict of interest exists in this case. see *Metro Life Ins. Co. v. Glenn*, 554 U.S. at 108. That structural conflict of interest is exacerbated by the fact that the administrative record reveals email communications between the claims adjuster, Karen Doyle, and Richard Goldberg, a member of Defendant's "business unit." PSOF 6. Those communications make clear that neither Ms. Doyle nor Mr. Goldberg believed that Plaintiff had properly increased his coverage to the principle sum limit of $500,000.00. PSOF 6. Further, it should be noted that Defendant initially insisted in at least two separate letters that Plaintiff was only covered by a principle sum limit of $50,000.00 instead of $500,000.00. PSOF 5-7. It was only after several months of investigation into the matter of the principle sum limit that Defendant finally altered its position, and agreed that Plaintiff's principle sum limit was indeed $500,000.00. PSOF 7. Clearly, Defendant: (1) suffered from a structural conflict of interest; (2) failed to segregate the claims handler from the business unit; and, (3) took conflicting positions throughout the claims handling process with regard to the applicable limit of benefits. See *Metro Life Ins. Co. v. Glenn*, 554 U.S. at 108; and, *Harlick v. Blue Shield of Calif.*, 686 F.3d at 707.

A court may weigh a conflict more heavily depending on its severity, and the influence that circumstances suggest it had on the plan administrator's decision to deny benefits. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d at 968. Clearly, the conflict borne by Defendant had an impact on the way that Plaintiff's claim was handled. Indeed, the emails between Ms. Doyle and Mr. Goldberg clearly indicate Defendant's institutional belief that Plaintiff was not entitled to the amount of benefits he was claiming. Further, it cannot be forgotten that if Defendant had granted Plaintiff's claim, it would have been forced to pay out 10X the amount that it believed he was eligible for. These circumstances suggest that the

conflict weighed heavily on the manner in which Defendant handled Plaintiff's claim. Accordingly, this Honorable Court should view Defendant's actions with a high degree of skepticism, and give little weight to its policy interpretations and factual conclusions. *See Metropolitan Life Ins. v. Glenn*, 554 U.S. 105 (2008); *Harlick v. Blue Shield of Calif.*, 686 F.3d 699 (9th Cir. 6-4-2012).

### B. *Defendant Abused its Discretion When Interpreting the Policy Terms*:

Defendant abused its discretion when it interpreted the policy's terms in a manner that allowed it to determine that no benefits were owed to Plaintiff because he was not Permanently and Totally Disabled at the time of the denial. Indeed, the original denial letter speaks of Plaintiff's condition in the present tense. PSOF 40. It does not even mention the fact that the relevant inquiry under the policy's provisions is whether Plaintiff's injury was such that it prevented him working for any income, at any job for which he was reasonably suited, for a period of 12 months following his injury. PSOF 40. By ignoring the policy's explicit language regarding the relevant time frame for Plaintiff's disability, Defendant interpreted the policy in an unreasonable manner. Accordingly, it abused its discretion in denying Plaintiff's claim. See *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 674 (9th Cir. 2011) (a plan administrator abuses its discretion when it interprets the policy terms in an unreasonable manner).

The Permanent and Total Disability provision in the policy obligates Defendant to pay a Permanent and Total Disability benefit as follows:

> "If an Insured becomes Permanently and Totally Disabled as a result of an Injury We will pay a Permanent and Total Disability Benefit provided that he or she becomes Permanently and Totally Disabled within 365 days of the Injury; and the Permanent and Total Disability continues for 12 months. The benefit payable equals the Insured's Principle Sum less any amount payable pursuant to this Policy.
>
> For purposes of this benefit, Permanently and Totally Disabled shall mean that the Insured is totally and continually disabled and cannot work, for any income, at any

job that he or she is reasonably suited by education, training or experience to do."

PSOF 8. The following definition is applicable to the foregoing insuring language:

> "Injury means bodily injury directly caused by accidental means which is independent of all other causes, results from a Hazard, and occurs while the Covered Person is insured under this policy."

PSOF 9. It should also be noted that the foregoing is subject to an exclusion, which states:

> "A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from…illness, disease or infection."

In analyzing whether or not Defendant abused its discretion by interpreting the policy in a manner inconsistent with its terms, a reviewing Court should look first to the "explicit language of the agreement to determine, if possible, the intent of the parties." *Harlick v. Blue Shield of Calif.*, 686 F.3d 699, 708 (9th Cir. 6-4-2012)(citing *Gilliam v. Nev. Power Co.*, 488 F3d 1189, 1194 (9th Cir. 2007). A review of the policy language in this case reveals that the term "Permanent and Total Disability" has a meaning other than that used in normal parlance. Indeed, the definition of "Permanent and Total Disability" contained in the policy does not contain <u>any</u> language regarding the permanency of a claimant's injury. Instead, it states that "Permanent and Total Disabled shall mean that the Insured is totally and continually disabled and cannot work, for any income, at any job that he or she is reasonably suited by education, training or experience to do." The only way that the policy accounts for the "Permanent" aspect of the disability is the statement in the insuring language wherein Defendant promises to pay the principle sum in the event the insured becomes disabled and remains that way for 12 continuous months.

Given the foregoing policy language, it is clear that in order to receive a benefit under the Permanent and Total Disability provisions of the policy, Plaintiff was required to submit to Defendant competent medical authority showing that he sustained an Injury by accidental means, and that the Injury alone caused him to be continually unable to work at any job for

which he was reasonably suited for a period of 12 months. In addition, Plaintiff was bound to demonstrate that the Injury causing his disability did so within 365 days of its occurrence. Plaintiff presented such evidence. Indeed, he showed that he was in an accident on August 25, 2009, and that the accident caused a T12 burst fracture. PSOF 22-26. He further demonstrated via Dr. Porter's surgical records that the T12 burst fracture was repaired on August 26, 2009, and that the recovery time for his surgery, during which he would be unable to work in even a sedentary capacity, would be at least 12 months. PSOF 26. Defendant's own IME doctor, Dr. Powers, agreed with Plaintiff's surgeon that he would be unable to work for 12 months following his surgery. PSOF 36. Given that Plaintiff provided records showing that his surgery occurred a day after his Injury, and that he could not work for at least a year following his surgery, he demonstrated via competent medical authority that he was disabled and unable to work at any job for a period of 12 months after his accidental injury. Accordingly, Defendant was obligated to pay the principle sum pursuant to the insuring language quoted above.

Despite the clear language contained in the policy, Defendant's denial letter makes clear that it believed that his disability actually had to be "permanent" in the general sense of the word. Indeed, the language quoted in Defendant's denial letter from their two IME doctors speaks not to Plaintiff's ability to work during the relevant 12 month period following the accident, but to his current status well after the closing of the 12 month window. PSOF 40, PSOF 36 (date of Dr. Powers IME was October 15, 2010, two months after the relevant 12 month window closed); PSOF 37 (Dr. Johnson's IME was performed approximately 9 months after the closing of the relevant 12 month window). Defendant's misinterpretation of the policy is also evidenced in the questions that it asked both of its IME doctors to answer, none of which addressed Plaintiff's status as disabled as a result of his

accidental injury within the 12 month window made relevant by the express terms of the policy. PSOF 36; PSOF 37.

Defendant's interpretation of the policy, which would require that Plaintiff be "permanently" disabled as opposed to totally disabled for 12 months, is unsupported by the policy's express language. It is unreasonable to read requirements into an insurance contract that simply aren't there. Accordingly, Defendant committed an abuse of discretion when it interpreted the policy in a manner inconsistent with its express terms. It should also be noted that Defendant's intentional and unreasonable policy interpretation is evidence of the impact that the aforementioned structural conflict of interest had during the claims process. Indeed, it shows that Defendant was set on denying Plaintiff's claim, regardless of what the policy actually said.

**C.** *Defendant Abused its Discretion When it Found that any Disability Plaintiff Suffered was Contributed to by illness, disease or infection*:

Plaintiff obviously suffered from health problems prior to his accident of August 25, 2009. Those problems included arthritis, which he advised his doctors at Arthrocare interfered with his ability to perform his daily functions. PSOF 18. However, Dr. Edwards has described Plaintiff's pre-accident problems as "minor." PSOF 16. Further, it cannot be forgotten that up until his accident of August 25, 2009, Plaintiff was able to work full time at a job with minimum physical requirements involving driving for long periods of time, lifting at least 50 pounds, and potentially protecting the cargo of an armored car with deadly force. PSOF 19-20. The fact that Plaintiff received raises steadily throughout his employment with Brinks suggests that he was able to fulfill the foregoing requirements without a problem. PSOF 21. Given the foregoing, it is clear that Plaintiff's arthritis and related ailments were not disabling.

The administrative record in this matter demonstrates that Plaintiff became disabled and unable to work following his accident of August 25, 2009. It was on that date that he suffered from a T12 burst fracture, which necessitated surgery involving the fixation of 5 vertebrae. PSOF 26. Plaintiff's surgery was performed on August 26, 2009. PSOF 26. Further, it cannot be discounted that every medical professional that has expressed an opinion regarding Plaintiff's recovery from the surgery agreed that he would need to be kept off work for at least one year. PSOF 27; PSOF 36. Accordingly, based upon the administrative record it is clear that Plaintiff's T12 burst fracture alone required that he be off of work for at least one year and one day, which triggers Defendant's duty to pay benefits pursuant to the Permanent and Total Disability provision in his policy. See PSOF 8, 9, 10.

Defendant's denial of Plaintiff's disability claim was in part based upon the conclusion that his arthritis caused or contributed to his disability. However, the administrative record demonstrates that he was able to work in spite of his arthritis. Further, Plaintiff's arthritis did nothing to contribute to his T12 burst fracture, which necessitated that he be kept off of work for at least one year following his surgery on August 26. PSOF 27.

Application of a standard "but for" causation test demonstrates that Plaintiff's arthritis is not causally related to his disability. One must ask, "but for" Plaintiff's arthritis, would he have been able to work during the year following his surgery? The undisputed answer is that he could not, due to the recovery time necessitated by the surgery required to repair his accidental T12 burst fracture. Accordingly, Plaintiff's arthritis and related conditions were not a cause or a contributing factor with regard to his inability to work for at least one year and one day following the accident of August 25, 2009. The same can be said regarding Plaintiff's Deep Vein Thrombosis in June, 2010, the renal failure that he experienced in July of that same year, and his depression, which is noted in the SSA

disability findings. See PSOF 33, 34, 29. In short, Defendant came to an illogical and implausible conclusion when it determined that Plaintiff's other ailments contributed to his disability, which was solely caused by the injuries sustained in his accident of August 25, 2009. See *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d at 675

### V. **Conclusion:**

At all times relevant to this matter Defendant operated under a structural conflict of interest, which was exacerbated by the fact that it did not believe that Plaintiff was entitled to make a claim for the principle sum limit of $500,000.00. After several months of claiming that the maximum benefit allowed under the policy was only $50,000.00, Defendant finally relented. Unfortunately, it then came up with a new way of refusing to pay the benefits owed under the terms of the policy.

All that Plaintiff had to do to obtain eligibility for a Total and Permanent Disability benefit under the policy was show that he sustained an accidental injury, and that the injury was the sole reason that he could not work at any job for which he was reasonably suited for a period of 12 continuous months. All of the experts that have expressed an opinion on the subject agree that the injury, a T12 burst fracture, required surgery to repair. Those same experts agreed that Plaintiff would not be able to work during the 12 month recovery period following his surgery. Plaintiff was injured on August 25, 2009, and had surgery the next day on August 26, 2009. Following that surgery he could not work at even a sedentary job for at least one year. PSOF 27, 36. Accordingly, Plaintiff was totally disabled for a minimum of 12 months and 1 day following his injury, which under the express terms of the policy obligates Defendant to pay a Permanent and Total Disability Benefit equal to the principle sum of $500,000.00.

Unfortunately, as a result of the significant conflict of interest that it faced, Defendant

unreasonably misconstrued the applicable policy terms, and then made factual findings that are wholly inconsistent with the evidence contained in the administrative record. In short, Defendant's denial of Plaintiff's claim for disability benefits amounts to an abuse of discretion, and should be overturned by this Honorable Court.

RESPECTFULLY SUBMITTED this  23rd  day of January, 2013.

**FRANKLIN & ASSOCIATES**

By/s/Colby R. Kanouse
　　Charles P. Franklin
　　Colby R. Kanouse
　　1920 East University Drive, Suite 102
　　Tempe, Arizona 85281
　　Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b), I certify a true and correct copy of the foregoing was filed with this Court electronically, and was served upon all parties via the operations of the Court's CM/ECF system.

　　　　　　　　　　　　　　　　　　　/s/Colby R. Kanouse