1
2
3
4
5
6                   IN THE UNITED STATES DISTRICT COURT
7                      FOR THE DISTRICT OF ARIZONA
8
   Robert Barbee,                    )
9                                     )
        Plaintiff,                    )    CIV 11-02586 PHX MEA
10                                    )
              v.                      )    ORDER
11                                    )
   Zurich American Insurance          )
12  Company,                          )
                                      )
13       Defendant.                   )
                                      )
14  _____ )

15           All of the parties have acquiesced to the exercise of
16  magistrate judge jurisdiction over this matter, including the
17  entry of final judgment.   Before the Court are Plaintiff's
18  motion for judgment as a matter of law (Doc. 36) and Defendant's
19  motion for judgment as a matter of law (Doc. 38).

20           In this matter Plaintiff challenges Defendant's denial
21  of benefits pursuant to a disability insurance plan governed by
22  the Employee Retirement Income Security Act of 1974 ("ERISA"),
23  codified at 29 U.S.C. §§ 1001-1461.   Plaintiff requested oral
24  argument with regard to his motion for summary judgment,
25  however, because the Court's review is limited to the
26  administrative record in this matter and because the motions are
27  not traditional motions for summary judgment as explained infra,
28  the Court concludes oral argument will not facilitate a
    resolution of the issues before the Court.

**I Standard of review**

Federal statutes codifying ERISA provide that a plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). See also Aetna Health Inc. v. Davila, 542 U.S. 200, 210, 124 S. Ct. 2488, 2496 (2004).

A motion for summary judgment in an ERISA case is "merely the conduit to bring the legal question before the district court, and the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply." Harlick v. Blue Shield of Calif., 686 F.3d 699, 706 (9th Cir. 2012), cert. denied, 133 S. Ct. 1492 (2013). See also Nolan v. Heald Coll., 551 F.3d 1148, 1154 (9th Cir. 2009). "Since a court reviewing for an abuse of discretion must review the administrative record and make something akin to a credibility determination about the plan administrator's decision to deny benefits, the court should set forth findings of fact and conclusions of law", pursuant to Rule 52. Burke v. Pitney Bowes Inc. Long Term Disability Plan, 640 F. Supp. 2d 1160, 1170 (N.D. Cal. 2009) (internal quotation and citation omitted).[1] "Accordingly, cross-motions may be decided pursuant to Rule 52

---

[1] Rule 52, Federal Rules of Civil procedure, provides:
In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

even where one or both parties has styled its motion as a motion for summary judgment." Id.  See also Pannebecker v. Liberty Life Assurance Co., 542 F.3d 1213, 1217 n.1 (9th Cir. 2008).

> "[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, [](1989). The Supreme Court has handed down a trio of opinions explaining the framework for review when those disputes reach the judiciary. See Conkright, 130 S.Ct. at 1646 (discussing the Court's two prior precedents, Firestone and Metropolitan Life Insurance Co. v. Glenn). The proper standard of review hinges, in part, on what the plan instrument says about interpretation. When the plan is silent, judges review its terms de novo. But, when the plan grants interpretive authority to its administrator, as is usually the case, a deferential abuse of discretion standard applies to the administrator's determinations.

Tibble v. Edison Int'l, 711 F.3d 1061, 1076-77 (9th Cir. 2013).

Because this matter involves a plan granting interpretive authority to the administrator, the Court reviews the decision denying benefits for an abuse of the administrator's discretion. See id.; Harlick, 686 F.3d at 706; Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 959 (9th Cir. 2006).  Under the abuse of discretion standard of review, a plan administrator's interpretation of the plan will not be disturbed if it is reasonable.  See Conkright v. Frommert, 559 U.S. 506, 130 S. Ct. 1640, 1646 (2010), quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S. Ct. 948, 954-55 (1989). "ERISA plan administrators abuse their discretion if they render decisions without any explanation, ...construe provisions of the plan in a way that conflicts with the plain

language of the plan or rely on clearly erroneous findings of fact." Day v. AT&T Disability Income Plan, 698 F.3d 1091, 1096 (9th Cir. 2012), cert. denied, 2013 WL 1147413 (Apr. 22, 2013) (internal citations and quotations omitted). A plan administrator abuses their discretion when their determinations are illogical, implausible, or without support, including inferences that may reasonably be drawn from the facts in the administrative record. See Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 675 (9th Cir. 2011).

The abuse of discretion standard requires the Court to "consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 630 (9th Cir. 2009).

> The manner in which a reviewing court applies the abuse of discretion standard, however, depends on whether the administrator has a conflicting interest.
> In the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard. In these circumstances, the plan administrator's decision can be upheld if it is grounded on any reasonable basis. In other words, where there is no risk of bias on the part of the administrator, the existence of a "single persuasive medical opinion" supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation.

Id. at 629-30 (internal citations and quotations omitted).

In cases where the plan administrator has a conflict of interest, the conflict is a factor the Court must consider in

-4-

the abuse of discretion review.  See Metropolitan Life Ins. Co.
v. Glenn, 554 U.S. 105, 108-11, 128 S. Ct. 2343, 2348 (2008);
Abatie, 458 F.3d at 966-68.  The weight of that factor depends
on the severity of the conflict.  See Glenn, 554 U.S. at 108,
115-117, 128 S. Ct. at 2346, 2350-51; Abatie, 458 F.3d at 968.

> A conflict arises most frequently where, as here, the same entity makes the coverage decisions and pays for the benefits. This dual role always creates a conflict of interest, but the conflict is more important ... where circumstances suggest a higher likelihood that it affected the benefits decision. The conflict is less important when the administrator takes active steps to reduce potential bias and to promote accuracy, such as employing a neutral, independent review process, or segregating employees who make coverage decisions from those who deal with the company's finances. The conflict is given more weight if there is a history of biased claims administration. Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim.

Harlick, 686 F.3d at 707 (internal citations and quotations
omitted).

> A structural conflict of interest is
> less important (perhaps to vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits.

Glenn, 554 U.S. at 126, 128 S. Ct. at 2356 (Kennedy, J.
concurring in part and dissenting in part).

1    Plaintiff argues that the Plan Administrator had an

2    inherent conflict of interest because the administrator was also

3    the payor of benefits.   Accordingly, Plaintiff contends, the

4    Court should "temper" the abuse of discretion standard of review

5    with skepticism.

6    In the instant matter, Defendant operated
     under a substantial structural conflict of
7    interest, and abused its discretion in
     denying Plaintiff's claim for Permanent and
8    Total Disability benefits by: (1)
     unreasonably misconstruing the plan's terms;
9    and, (2) making illogical and implausible
     factual findings that were unsupported by the
10   administrative record.

11   Doc. 36 at 8-9.

12   Plaintiff further alleges:

13   That structural conflict of interest is
     exacerbated by the fact that the
14   administrative record reveals email
     communications between the claims adjuster,
15   Karen Doyle, and Richard Goldberg, a member
     of Defendant's "business unit." PSOF 6. Those
16   communications make clear that neither Ms.
     Doyle nor Mr. Goldberg believed that
17   Plaintiff had properly increased his coverage
     to the principle sum limit of $500,000.00.
18   PSOF 6. Further, it should be noted that
     Defendant initially insisted in at least two
19   separate letters that Plaintiff was only
     covered by a principle sum limit of
20   $50,000.00 instead of $500,000.00. PSOF 5-7.
     It was only after several months of
21   investigation into the matter of the
     principle sum limit that Defendant finally
22   altered its position, and agreed that
     Plaintiff's principle sum limit was indeed
23   $500,000.00. PSOF 7. Clearly, Defendant: (1)
     suffered from a structural conflict of
24   interest; (2) failed to segregate the claims
     handler from the business unit; and, (3) took
25   conflicting positions throughout the claims
     handling process with regard to the
26   applicable limit of benefits.

27   Id. at 10.

28

-6-

When the Court conducts de novo review in an ERISA matter, i.e., when there is no conflict of interest, the plaintiff bears the burden of establishing their entitlement to the denied benefits. See <u>Muniz v. Amec Constr. Mgmt., Inc.</u>, 623 F.3d 1290, 1294 (9th Cir. 2010). However,

> [i]f the plan administrator or decision maker is also the party from whose pocket the claim would have to be paid, such as an insurer or an employer sponsoring a self-funded plan, the court must determine whether the denial of benefits was improperly affected by this conflict of interest. The burden of proving that its decision was not improperly influenced has, logically, been placed on that administrator. <u>See</u>, <u>e.g.</u>, <u>Tremain v. Bell Indus., Inc.</u>, 196 F.3d 970, 976 (9th Cir. 1999) (when a claimant produces evidence that a plan administrator's self-interest caused a breach of the administrator's fiduciary obligations to the claimant, a rebuttable presumption arises in favor of the claimant and the plan bears the burden of proving that a conflict of interest did not affect its decision to deny or terminate benefits).

<u>Id.</u>

**II Findings of fact**

The administrative record consists of all documents "Bates"-stamped ZAIC No. 1-2425, and the record is docketed in this matter at docket number 33 and docket number 44. Based on the record on appeal, the Court finds the following facts:

At all times relevant to this matter, including August 25, 2009, Plaintiff was an employee of Brinks U.S., Inc. ("Brinks"). Accordingly, Plaintiff was eligible to enroll in a group accident policy provided for the benefit of Brinks' employees. Plaintiff enrolled in the group accident policy and purchased disability insurance coverage according to the policy's terms. At all times relevant to this matter, Plaintiff

was covered by $500,000.00 of accidental disability coverage, payable pursuant to the terms of the policy.[2]

The Permanent and Total Disability provisions of the policy state:

> If an Insured becomes Permanently and Totally Disabled as a result of an Injury We will pay a Permanent and Total Disability Benefit *provided that he or she becomes Permanently and Totally Disabled within 365 days of the Injury; and the Permanent and Total Disability continues for 12 months.* The benefit payable equals the Insured's Principle Sum less any amount payable pursuant to this Policy. *For purposes of this benefit, Permanently and Totally Disabled shall mean that the Insured is totally and continually disabled and cannot work, for any income, at any job that he or she is reasonably suited by education, training or experience to do.*

Doc. 8, Exh. A (emphasis added).

The policy states that the "Permanent and Total Disability must be verified by a competent medical authority." Id.

The policy contains the following definitions:

1. "Injury means bodily injury directly caused by *accidental means which is independent of all other causes*, results from a Hazard, and occurs while the Covered Person is insured under this policy."

2. "Covered Person means any person who has insurance under the terms of this Policy. It includes the Insured."

_____

[2] Defendant initially asserted to Plaintiff that Plaintiff was only covered by $50,000.00 of accidental disability coverage. Plaintiff challenged this contention and, after a period of nine months, Defendant conceded Plaintiff had purchased an accidental disability policy with a benefit limit of $500,000.00.

3. "Hazards are those events described in the Hazard pages attached to this policy to which the Coverages and Enhanced Benefits apply. The Hazards are listed on the schedule."

4. "Covered Loss means a loss which meets the requisites of one or more Coverage or Enhanced Benefit, results from a Hazard, and for which benefits are payable under this Policy."

Additionally, the "Permanent and Total Disability" provisions of the policy are subject to the following exclusion: "*A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from...illness, disease or infection*." Id. (emphasis added)

Notably, the policy designates Defendant as the payor of claims and also designates Defendant as the claims fiduciary of the plan, and gives Defendant the right to determine eligibility for benefits and to construe the terms of the plan. Id. All "Proof of Loss" must be acceptable to Defendant. Id.

Plaintiff has a high school diploma and prior to 1996 worked in a restaurant.

From January 1996 until early November of 1998, Plaintiff worked as a furniture hauler for Aaron's Rentals. See ZAIC 2116 & ZAIC 2383. Plaintiff left his job at Aaron's Rentals in November of 1998 "because hauling furniture was too hard on his body." ZAIC 2383. From November of 1998 until November of 2003, a period of approximately five years, Plaintiff worked for Loomis Fargo as a driver guard. See ZAIC 2116. In late November of 2003, Plaintiff returned to working

at Aaron's Rentals.   <u>See</u> ZAIC 2383; ZAIC 1921.   In August of 2006, Plaintiff began working as a security guard for Brinks. ZAIC 2122.

On November 3, 11, and 14, 2003, while working as a driver for Loomis Fargo, Plaintiff sought treatment from Stephen Bair, D.O., for back pain that Plaintiff described as constant and that Plaintiff rated as a seven for severity on a scale of one to ten.   <u>See</u> ZAIC 1911; ZAIC 1909; ZAIC 1907; ZAIC 1905.   On or about December 17, 2003, Plaintiff reported to Dr. Bair that the pain was resolved, rating the pain as a two out of ten on the severity scale.   Plaintiff told Dr. Bair that he experienced pain after long days at work.   <u>See</u> ZAIC 1903.

Some years prior to the 2009 accident giving rise to this dispute, Plaintiff was diagnosed with psoriatic arthritis and cutaneous arthritis.   As a result of these conditions, Plaintiff experienced diffuse joint pain throughout his body and soreness in his back.   On September 9, 2005, Plaintiff completed a form titled "Activities & Lifestyle Index," for treatment at ArthroCare, an arthritis treatment and research practice.   On the form Plaintiff reported that his physical condition and pain were worse than the previous month and that he had some or much difficulty engaging in activities of daily living.   Plaintiff stated that, at that time, he was very dissatisfied with his current medical condition.   <u>See</u> ZAIC 1623.

On May 10, 2008, Plaintiff sustained injuries to his back and neck in a motor vehicle accident and was unable to work on May 10, 13, and 14, 2008.   <u>See</u> ZAIC 2392; ZAIC 1241.   On November 24, 2008, Plaintiff was released "from active care at

-10-

80-85% improvement from injuries he sustained" on May 10, 2008. ZAIC 1241.

On August 24, 2009, Plaintiff sought treatment from ArthroCare.  On an Activities & Lifestyle Index form completed that day, Plaintiff reported "much difficulty" dressing himself, getting in and out of bed, lifting a full cup or glass to his mouth, walking outdoors on flat ground, washing and drying his entire body, bending down to pick up clothing from the floor, turning regular faucets on and off, and getting in and out of a car. ZAIC 1767.

Notwithstanding his physical condition and pain, prior to the accident of August 25, 2009, Plaintiff had continuously worked full-time for several years as an armored car driver or "hopper" for Brinks.  Plaintiff's job duties included driving and loading and unloading an armored car, and maintaining the security of the vehicle and its cargo.  Plaintiff was required to lift a minimum of 50 pounds, pass a Department of Transportation physical examination and drug screening, and work in an armed environment.

On August 25, 2009, Plaintiff was involved in a motor vehicle accident on a freeway in Phoenix, Arizona.  Following the accident Plaintiff was transported to a hospital by the Phoenix Fire Department, where he was admitted for severe back and neck injuries.  An MRI performed upon Plaintiff's admission to the hospital revealed "moderate right foraminal disk extrusion producing right C4-5 foraminal narrowing and mild effacement upon the right lateral ventral thecal sac." ZAIC No. 660.  An MRI was also performed on Plaintiff's lumbar spine on

1  August 26, 2009.  The physician noted that:

2        there is redemonstration of the patient's T12
          compression fracture with less than 20% loss
3        of vertebral body height and mild
          retropulsion. There is T2 hyperintense signal
4        within the T12 vertebral body consistent with
          acute fracture and associated edema. There is
5        no epidural collection. There is no
          significant canal stenosis of the T11-12
6        level. The remaining marrow signal is
          unremarkable. The lumbar nerve root
7        distribute unremarkably within the thecal
          sac. There is mild disc signal and height
8        loss at L5-S1 where there is a central disc
          protrusion and an associated annular fissure.
9        No significant canal stenosis is present.
          There is no foraminal narrowing. The L4-5
10       level demonstrates a mild diffuse disc bulge
          without significant canal stenosis or
11       foraminal narrowing.

12  ZAIC No. 662.

13       On August 26, 2009, the day after the accident, Dr.

14  Porter performed surgery on Plaintiff. During the surgery Doctor

15  Porter performed a T10, T11, T12, L1, L2 pedicle screw fixation

16  with fusion in order to stabilize Plaintiff's burst fracture at

17  T12.   ZAIC 1076.   Following Plaintiff's surgery, Dr. Porter

18  opined:

19       Clearly this was a very serious motor vehicle
          accident with a thoracic 12 burst fracture.
20       He underwent surgery which fixated this
          fracture. I would keep him off work for the
21       period of 1 year. After that, assuming his
          fracture is well healed and he is, for the
22       most part, not having pain, he likely could
          go back to work in a sedentary capacity
23       initially and maybe even one that involves
          physical labor.

24

25  ZAIC No. 1076-1077.

26       Following the August 26, 2009 surgery, managing

27  Plaintiff's pain required that Plaintiff take large amounts of

28  narcotic analgesics, including Oxycontin, Morphine, Demerol, and

-12-

Oxycodone.  See ZAIC No. 1177-1203 & ZAIC No. 1239.

In a letter dated March 2, 2010, Defendant reiterated its January 13, 2010, request that Plaintiff provide additional information related to his prior injuries.  See ZAIC 101.

On June 16, 2010, Plaintiff was hospitalized at Banner Gateway Medical Center after developing deep vein thrombosis in his lower left leg.  See ZAIC 281.  During his stay in the hospital an IVC filter was placed in his leg and the physician attempted a thrombolysis procedure, which was aborted during surgery.  Plaintiff was hospitalized at Banner Gateway Medical Center for treatment of his deep vein thrombosis from June 4, 2010, to June 10, 2010.  See ZAIC 283 & 295.

On July 9, 2010, Plaintiff was hospitalized at Banner Baywood Medical Center, for acute renal failure and altered mental status.  See ZAIC No. 399-400 & 409-11.  The hospital records indicate that Plaintiff's renal failure was the result of toxic levels of medications in his system and dehydration caused by nausea and vomiting.  Id.  During the course of Plaintiff's hospitalization the doctors at Banner Baywood noted that his creatinine levels improved. Plaintiff was discharged with instructions to alter his medication regimen to exclude lisinopril and ibuprofen.  Id.

In a letter dated August 18, 2010, Defendant requested information as to whether Plaintiff had been awarded Social Security Disability Income benefits.  See ZAIC 1003.

In a decision issued August 25, 2010, the Social Security Administration ("SSA") determined Plaintiff was "disabled", with a primary diagnosis of "organic mental

-13-

disorder" and a secondary diagnosis of "affective disorder". ZAIC 1979.   Plaintiff was determined to be disabled with a primary diagnosis of mental disorder due to mood instability "*on the heels of* his severe back injury in 8/09."   ZAIC 1979-91 (emphasis added).   The SSA found Plaintiff became disabled on August 25, 2009, the date of his motor vehicle accident.   In the "Findings of Fact and Analysis of Evidence" section of the SSA's report, the diagnoses given by Plaintiff's evaluator were "Moderate Mental Retardation, Depressive Disorder, Panic Disorder without agoraphobia, PTSD and chronic back pain."   Id.

The one-year "anniversary" of Plaintiff's accident was August 25, 2010.

In a letter dated September 21, 2010, Plaintiff sent Defendant a copy of the SSA's Notice of Award, which stated Plaintiff "is entitled to monthly disability benefits beginning February 2010".   Plaintiff did not provide the basis for the SSA's determination and award of SSDI benefits.   See ZAIC 1158-1163.[3]

At the request of Defendant for an independent medical examination ("IME"), Plaintiff saw Dr. Powers, a neurologist with Affiliated Neurologists, LTD, on October 15, 2010.   ZAIC No. 1234-35.   In reviewing the records of Plaintiff's surgeon, Dr. Porter, Dr. Powers opined that:

> Dr. Porter quite reasonably concluded that Mr. Barbee would be expected to have improved such that he could return to sedentary activity and possible labor after one year

---

[3]   Plaintiff provided a copy of the SSA's Disability Determination, including the SSA's Findings of Fact and Analysis of Evidence, to Defendant on September 23, 2011.   ZAIC 1977.

1    from the initial injury. That time frame has
2    now passed. It should be noted that Mr.
    Barbee is illiterate and options available to
    him for sedentary activity may be limited.
3

4 <u>Id.</u>

5   Dr. Powers' IME report dated October 15, 2010, was

6 based on his review of Plaintiff's medical records and his

7 examination.  Dr. Powers concluded: "[f]rom a neurologic

8 perspective he is not disabled by any identifiable neurological

9 disorder." ZAIC 1219-1225.

10   On May 3, 2011, Plaintiff was discharged as a patient

11 from ArthroCare due to his failure to appear, cancellation, or

12 rescheduling of four appointments while "continuing to receive

13 medications including narcotic analgesics."  ZAIC 1789.

14   On June 29, 2011, approximately 22 months after his

15 surgery, Plaintiff underwent a psychological IME with Dr.

16 Patricia Johnson.  <u>See</u> ZAIC No. 1873-88.  Dr. Johnson performed

17 a standardized reading test and noted that Plaintiff's reading

18 abilities ranked in the bottom percentile.  She further noted

19 that his general fund of knowledge was very poor and that his

20 ability to form verbal abstractions was very poor for his age.

21 <u>Id.</u>  Dr. Johnson further opined that Plaintiff's test scores

22 were consistent with low academic achievement and that his

23 overall intelligence ranked in the below average to low average

24 range.  Dr. Johnson opined Plaintiff did not evidence any

25 psychological issues that would result in permanent or total

26 disability as a result of his accident on August 25, 2009.  <u>Id.</u>

27   On or about July 14, 2011, Dr. Powers, the neurologist

28 who had evaluated Plaintiff in October of 2010, was provided

with additional records from ArthroCare and surveillance videos of Plaintiff taken on March 28, 29, and 30, 2011.  See ZAIC 1938-40.  Dr. Powers then stated:

> The above records document a long history of diffuse pain complaints and reported diffuse limitation in function preceding the motor vehicle accident. Dr. Johnson did not find evidence of a cognitive or psychological problem that she would relate to the accident and documented his cognitive limitations while indicating that he likely was exaggerating them. The surveillance video clearly indicates that he is exaggerating his impairments. He appears to move freely, bending and lifting without limitation and walking without a cane in the surveillance video. He drives a car without apparent difficulty. This again is in striking contrast to the symptoms reported and the examination demonstrated at the time of the independent medical evaluation. This magnitude of change strongly suggests that he is consciously manipulating his symptoms for personal gain. That is malingering.

ZAIC 1938-40.

Dr. Johnson viewed the surveillance videos and additional records reviewed by Dr. Powers.  See ZAIC No. 2409. Dr. Johnson concluded that nothing she saw or read would alter the opinions previously expressed in her report of June 29, 2011.  Id.

On July 28, 2011, Defendant denied Plaintiff's application for benefits under the policy's Permanent and Total Disability Provisions.  Plaintiff appealed this decision.  On December 5, 2011, Defendant denied Plaintiff's appeal of the original denial of his claim.  Defendant's denial of Plaintiff's appeal was based upon the same grounds as the original denial, i.e., Defendant concluded Plaintiff was not permanently and totally disabled as a result of an injury and, if he was, that

-16-

the disability was caused or contributed to by disease, illness, or infection unrelated to the motor vehicle accident of August 25, 2009.

> Plaintiff now seeks review of that determination, and submits that Defendant abused its discretion by misconstruing the terms of the policy and denying his claim without factual justification. Defendant operated under a substantial structural conflict of interest, and abused its discretion in denying Plaintiff's claim for Permanent and Total Disability benefits by: (1) unreasonably misconstruing the plan's terms; and, (2) making illogical and implausible factual findings that were unsupported by the administrative record.

Doc. 36 at 2.

**III Statement of applicable law**

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan or (3) relies on clearly erroneous findings of fact." Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).  A finding of fact is clearly erroneous when, although there is record evidence to support the finding, the Court nonetheless is "left with the definite and firm conviction that a mistake has been committed" after reviewing all the evidence.  Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 622, 113 S. Ct. 2264, 2279-80 (1993).

When determining whether an administrator abused its discretion in denying benefits, the Court considers: (1) the weight afforded to any structural conflict of interest; (2) the "quality and quantity of the medical evidence"; (3) "whether the

plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records"; (4) "whether the administrator provided its independent experts with all of the relevant evidence"; and (5) "whether the administrator considered a contrary SSA disability determination."  <u>Montour</u>, 588 F.3d at 630 (internal quotation and citation omitted).

**IV Analysis**

**A. Plaintiff contends that the Court must view the Plan Administrator's decision denying benefits with skepticism because the plan administration involved a structural conflict of interest**

There is a structural conflict of interest because the Defendant is the payor of benefits and has the power to construe the terms and definitions of the plan and also has the power to deny benefits.   Accordingly, the Court's abuse of discretion review includes viewing the Plan Administrator's denial of benefits with some skepticism.

There was an adequate quantity and quality of medical information in the record, including two IMEs and the opinions of specialists based on clinical tests and evaluations.   The Plan Administrator did not, apparently, conduct an in-person interview with Plaintiff but instead conducted a paper review of the record.

The Plan Administrator provided its independent experts with the relevant evidence, including Plaintiff's medical records and video surveillance of Plaintiff which was conducted at Defendant's behest.

The Plan Administrator did not consider the SSA's contrary disability determination.  In denying benefits, the Plan Administrator stated that Plaintiff had not met his burden of providing competent medical authority establishing he was permanently disabled as result of an injury.  The Plan Administrator notes that Plaintiff may not be found disabled based on his illiteracy, and also notes Plaintiff previously worked as a cook and as a driver.  The opinion lists the medical evidence in the record, including the independent medical examinations conducted at the request of Defendant, and including opinions by physicians who are specialists in their field and object clinical test results.  The Plan Administrator sought more than one independent medical examinations of Plaintiff, supplying the examiners with Plaintiff's medical records.  In addition to supplying the examiners with Plaintiff's medical records, Defendant supplemented those records with video tapes, acquired at Defendant's behest in March of 2011, of Plaintiff engaging in activities which Defendant contends belie Plaintiff's claims of being disabled.

Defendant requested the SSA's determination regarding Plaintiff's disability status from Plaintiff.  In late September of 2010 Plaintiff informed Defendant that he had been found disabled in August of 2010 with a date of onset of disability of August 29, 2009.  However, Plaintiff did not provide Defendant with a complete copy of the decision finding Plaintiff disabled and awarding benefits until late September of 2011, two years after the accident giving rise to his claim and one year after the SSA's decision was issued.

The Plan Administrator's opinion denying benefits does not discuss or note the SSA determination that Plaintiff is disabled.[4]  The Ninth Circuit Court of Appeals has concluded that such a procedural failure in a matter involving an abuse of discretion standard of review generally requires the matter be remanded.  <u>See</u> <u>Salomaa</u>, 642 F.3d at 679[5]; <u>Montour</u>, 588 F.3d at 635[6].

"Procedural errors by the administrator are ... weighed in deciding whether the administrator's decision was an abuse of discretion." <u>Salomaa</u>, 642 F. 3d at 674.  However, "a single honest mistake in plan interpretation administration does not deprive the plan of the abuse of discretion standard." <u>Id.</u> (internal citations omitted).  "Ordinarily, a proper

---

[4] At the time the Plan Administrator issued its initial decision, the complete SSA determination was not provided to the Plan Administrator.  It was provided to the Plan Administrator after the decision denying benefits had been appealed.

[5]

The Social Security Administration was persuaded that Salomaa was indeed unable to work at any job in the national economy, and awarded disability benefits to him. Its award was provided to the plan administrator. Amazingly, the plan's initial and final denial letters do not even mention the Social Security award. Social Security disability awards do not bind plan administrators, but they are evidence of disability. Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion. Weighty evidence may ultimately be unpersuasive, but it cannot be ignored.

[6]

While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was "the product of a principled and deliberative reasoning process." In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.

acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." <u>Montour</u>, 588 F.3d at 636. "[R]egulations promulgated by the Secretary of Labor authorize, if not require, plan administrators working with an apparently deficient administrative record to inform claimants of the deficiency and to provide them with an opportunity to resolve the problem by furnishing the missing information." <u>Id.</u>, <u>citing</u> 29 C.F.R. § 2560.503-1(f)(3)-(4), (g)(1)(iii).

In this matter it appears the Plan Administrator asked Plaintiff to provide the Plan Administrator with the SSA's decision and the basis for the decision, which was not supplied to Defendant in its entirety until September of 2011. "When an administrator can show that it has engaged in an "'ongoing, good faith exchange of information between the administrator and the claimant,'" the Court should give the administrator's decision broad deference notwithstanding a minor irregularity." <u>Abatie</u>, 458 F.3d at 972.

Applying the factors stated in <u>Boyd</u> and <u>Montour</u>, and en viewing the Plan Administrator's decision with "some skepticism," the Court concludes that the decision denying benefits was not an abuse of discretion.

1        **B. Plaintiff contends the Plan Administrator abused its**
2   **discretion in interpreting the policy's terms to determine**
    **whether Plaintiff was entitled to benefits based on his physical**
3   **condition more than twelve months after his injury**

4              Plaintiff asserts:

5              Defendant abused its discretion when it
               interpreted the policy's terms in a manner
6              that allowed it to determine that no benefits
               were owed to Plaintiff because he was not
7              Permanently and Totally Disabled at the time
               of the denial. ... the relevant inquiry under
8              the policy's provisions is whether
               Plaintiff's injury was such that it prevented
9              him working for any income, at any job for
               which he was reasonably suited, for a period
10             of 12 months following his injury.
               ***
11             Given that Plaintiff provided records showing
               that his surgery occurred a day after his
12             Injury, and that he could not work for at
               least a year following his surgery, he
13             demonstrated via competent medical authority
               that he was disabled and unable to work at
14             any job for a period of 12 months after his
               accidental injury.
15             ***
               Defendant's interpretation of the policy,
16             which would require that Plaintiff be
               "permanently" disabled as opposed to totally
17             disabled for 12 months, is unsupported by the
               policy's express language. It is unreasonable
18             to read requirements into an insurance
               contract that simply aren't there.

19

20  Doc. 36 at 13-14.

21             Defendants argue:

22             Barbee's assertion that he cannot work as an
               armored car driver—[] does not support the
23             conclusion he cannot work at any job for
               which he is qualified by education and
24             experience as required by the Plan. Of
               further significance to the ERISA Review
25             Committee was the November 2011[7] surveillance
               of Barbee, which showed him frequently
26

27  _____

         [7] Defendant's Statement of Facts indicates that video of
28  Plaintiff was obtained in both March of 2011 and November of 2011.
    See, e.g., Doc. 29 at 32.

                              -22-

walking without a cane or other assistance and carrying and lifting various items in and out of his house. (SOF ¶ 226) In short, the evidence in the administrative record supports Zurich's decision to deny Barbee's claim because Barbee failed to provide any competent medical authority verifying he is Permanently and Totally Disabled. Zurich's determination that Barbee is not Permanently and Totally Disabled as a result of an Injury and ensuing denial of benefits were not an abuse of discretion.

Doc. 38 at 12-13.

As noted supra, the policy states:

If an Insured becomes Permanently and Totally Disabled as a result of an Injury We will pay a Permanent and Total Disability Benefit provided that he or she becomes Permanently and Totally Disabled within 365 days of the Injury; and the Permanent and Total Disability continues for 12 months. The benefit payable equals the Insured's Principle Sum less any amount payable pursuant to this Policy. For purposes of this benefit, Permanently and Totally Disabled shall mean that the Insured is totally and continually disabled and cannot work, for any income, at any job that he or she is reasonably suited by education, training or experience to do.

Doc. 8, Exh. A.

The plan language of the plan might be considered ambiguous with regard to the issue raised by Plaintiff. See Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc., 125 F.3d 794, 799 (9th Cir. 1997) ("The Plan language presents an almost classic ambiguity.... Both Kunin and Phillips considered a similar phrase, "mental illness," and held that it was ambiguous in that it could reasonably refer either to illnesses with non-physical causes, or to illnesses with physical causes, but exhibiting both physical and non-physical

symptoms."). Because Plaintiff has shown the presence of a "taint" or conflict of interest in the claims structure with regard to Defendant's administration of the plan, the Court is not required to uphold Defendant's interpretation of the contested clause as reasonable, as would be required if there were no conflict of interest. See id. Instead, where a conflict exists and a plan provision's interpretation is challenged, Lang instructs the district courts to construe the ambiguous clause "in accordance with the rules normally applied to insurance policies and ambiguities in ordinary insurance contracts are construed against the insurance company." Id.

The language of this provision requires that, to be eligible for the benefit, the claimant must be both permanently and totally disabled within one year of the injury and that the disability must continue for one year after the injury. The provision implies that "permanently and totally disabled" is defined as sustaining an injury which disables the claimant for *at least* one year and to construe the language otherwise renders the term "permanent" superfluous. Accordingly, the Court concludes Defendant did not abuse its discretion by interpreting the plan to exclude an injury which disables a claimant for a period of one year but which is not permanent.

**C. Plaintiff contends Defendant improperly concluded that his disability was due at least in part to pre-existing medical conditions, rendering his claim subject to the policy exclusion**

Plaintiff also contends that the Plan Administrator abused its discretion when it found that any disability was due to an illness, disease, or infection, rather than the August

2009 car accident, an exclusion in the policy.

As stated supra, the plan defines the term "Injury" as "a bodily injury directly caused by accidental means which is independent of all other causes."  The Plan excludes coverage for loss "caused by, contributed to, or resulted from...illness, disease or infection."

Defendant contends:

> Even if Barbee could be considered to be Permanently and Totally Disabled, which Zurich denies, any disability was not the result of an Injury as defined in the Plan, but rather was the result of an "illness, disease or infection" and, therefore, is excluded from benefits under the Plan. The credible and undisputed evidence from Barbee's own medical records demonstrates that Barbee suffered from arthritis and complaints of severe, diffuse pain several years before the August 25, 2009 accident. (SOF ¶¶ 7, 9-17, 19, 21-33, 45-51, 53- 56) In addition, Barbee sustained injuries to his neck and back in a May 10, 2008 motor vehicle accident. (SOF ¶ 57) On April 13, 2009, four months before the August 25, 2009 accident, Barbee reported he believed his condition may interfere with his ability to work. (SOF ¶ 71) On August 24, 2009, the day before the August 25, 2009 accident, Barbee reported "much difficulty" getting in and out of bed, lifting a glass to his mouth, walking, entering and exiting a car, and bending to pick clothes up from the floor.

Doc. 38 at 13.

In ERISA cases, it is "well-established that the burden is upon the insurer to demonstrate that the insured's claim falls within the terms of an exclusionary clause, and that such clauses are interpreted narrowly." <u>Frerking v. Blue Cross-Blue Shield of Kan.</u>, 760 F. Supp. 877, 881 (D. Kan. 1991).  If there is confusion as to the primary cause of an ERISA beneficiary's

disabling symptoms, then the plan administrator does not abuse its discretion in determining that the disability is not covered by the policy. <u>See</u> <u>Boyd</u>, 410 F.3d at 1179. <u>Compare</u> <u>McClure v. Life Ins. Co.</u>, 84 F.3d 1129, 1136 (9th Cir. 1996) (holding that, if the exclusionary language is conspicuous it bars recovery even if the claimed injury was a predominant or proximate cause of the disability); <u>Miller v. Monumental Life Ins. Co.</u>, 761 F. Supp. 2d 1123, 1140 (D.N.M. 2009); <u>Weis v. Accidental Death & Dismemberment Benefit Plan of Kaiser Found. Health Plan Inc.</u>, 442 F. Supp. 2d 850, 853 (N.D. Cal. 2006).

There is ample evidence in the record that Plaintiff suffered from other health issues prior to the accident. Accordingly, the Plan Administrator did not abuse its discretion by concluding as a matter of fact that Plaintiff's disabilities arose from prior medical conditions and his claim was subject to the cited exclusion in the policy.

**V Conclusion**

The Plan Administrator did not abuse its discretion in determining that Plaintiff was not completely and permanently disabled as a result of the August 2009 accident and denying benefits pursuant to the plan. Accordingly,

**IT IS ORDERED that** Plaintiff's motion (Doc. 36) for judgment as a matter of law is **denied**.

**IT IS FURTHER ORDERED that** Defendant's motion (38) for judgment as a matter of law is **granted**. Judgment is entered in favor of Defendant and against Plaintiff with regard to the claims stated in the complaint.

-26-

1          The Clerk of the Court shall enter separate judgment

2    accordingly.

3          DATED this 21st day of May, 2013.

4

5          _____
                     Mark E. Aspey
6             United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28